2-13-1291, People of the State of Illinois, Kevin Zellner v. Mario Casciaro, Defendant Appellant. Arguing on behalf of the Appellant, Ms. Kathleen Zellner, arguing on behalf of the Appealtees, Mr. David Bernhardt. Ms. Zellner. May it please the Court, I'm Kathleen Zellner, representing the Appellant, Mario Casciaro. I want to start this morning by trying to the issue, many issues were raised in the brief, but the key issue, I believe, is whether there was sufficient evidence that intimidation occurred and that that was a predicate felony for the felony murder conviction. It's the Appellant's position there is insufficient, really a total lack of evidence that there was any intimidation on behalf of the Appellant. I think that the State has conceded in their brief that we're talking about an inferred intent type of intimidation. There's really no dispute that Mr. Lamb testified that he was only asked by the Defendant to talk to Brian Carrick about the money that was owed. And I'd say just as an overview, we dispute entirely that the conversation never occurred. But I'm going to deal with that issue. Which conversation never occurred? The conversation, the phone conversation between Mr. Lamb and Mr. Casciaro that occurred, supposedly, although there's no evidence of that, no phone records, there's absolutely no evidence that phone conversation ever occurred. And you're basing that particular position on the lack of phone records as opposed to any testimony, correct? Not only the lack of phone records, but the testimony itself by Mr. Lamb. Let's just assume, taking my most favorable to the State, that phone conversation occurred. And that Mr. Casciaro asked Mr. Lamb to talk to Mr. Carrick. It is the Appellant's position that that does not satisfy the requirements of the specific intent statute of intimidation. But now, when Lamb suddenly appeared, when the defendant was arguing with Carrick about the money that was owed, wouldn't that, in and of itself, communicate a threat? Absolutely. We've got two against one. And we know that Lamb was a lot larger in stature than Carrick. Why wouldn't that communicate a threat? Because the evidence that the jury heard was that Mr. Lamb himself had a reason to talk to Carrick. And that was because he didn't want Carrick to prevent the further drug activities by not repaying Mr. Casciaro. And setting up a standard, because an individual is larger and may appear at a scene, I think would be an unmanageable standard. Besides that, as the court has just stated, Mr. Casciaro started the conversation. And so that alone, that fact alone, that he started the conversation about the money undercuts the state's whole theory that the reason for having Mr. Lamb come to the scene was to coerce and force Mr. Carrick to pay the money. So if an argument's already going on, clearly Mr. Casciaro has taken the lead, the initiative to get his money back. He doesn't need Mr. Lamb. And then if the court wants to use physical size, how in the world would that ever be regulated? Would it be someone, you know, would we have height and weight measurements or someone that looks really scary? And then compounding that problem is there's no evidence, not a single person ever saw Mr. Lamb return to the store. There's no evidence. From whose point of view do we look at this? Is it from the point of view of Carrick and do we look at was he or could he have been intimidated by, again, the two people who, you know, were confronting him or by being muffed, hit into the cooler, pushed into the cooler? Or is it from the point of view of Lamb and the defendant, whether or not they had this specific intent to threaten? So how do we as a court look at this evidence? If I may respond, because I think that's an excellent question. If we look at it from the point of view of Brian Carrick, so if we look at a subjective intent standard which has been recognized in People v. Peterson, there is no evidence that Brian Carrick was afraid of Shane Lamb. They worked together every day. They had a cordial conversation at 4 p.m. that day. This isn't a hit man that shows up on the scene. This is someone that he's apparently comfortable with. There's evidence in the record that Brian Carrick apparently is arguing with the two of them. He's not really intimidated by them. So if you evaluate subjective intent, Brian Carrick did not know about Lamb's juvenile record. Brian Carrick... Excuse me, do we know that? Yes, yes. There's no proof at all that he knew of his juvenile record. There's no proof... That he did, but that's different than saying he didn't, right? True, you're right. But I think if there had been proof that he had known of that, that it was well-known that Lamb was the, you know, intimidator, the muscle of some drug operation, that evidence would have been presented. But there's an absence of evidence of that. Go ahead. So if we look at it from Brian Carrick's point of view, it's really different than a situation where a stranger appears that's, you know, very large and threatening that maybe he knows someone has told him has a criminal record. There's no evidence he knows any of that. But he had a very comfortable relationship with Shane Lamb. And when Shane Lamb testified in front of the grand jury, he described that relationship before he made his immunity deal with the state, that they got along quite well, he felt protected towards him, and there was never a harsh word, much less a violent action towards him. And Lamb was his supervisor, is that right? Yes, yes. So that would be from the point of view of Brian Carrick. If we look at it from the defendant, Keshara, and Mr. Lamb's point of view, there's that absence of a specific request, a specific, you know, request that would meet the requirements of the intimidation statute. So then you get into an inferred intent situation, where if you simply can ask someone to go talk to someone about money, you could be at a golf game and ask somebody to go and talk to someone about money, you would have, I think, an unworkable standard for intimidation. Of course, we've never had intimidation as the predicate felony in a felony murder case in Illinois, and I couldn't find it anywhere else in the country either.  let's just assume that for a moment. When Mr. Keshara, when he calls Lamb and says, hey, you know, Carrick got paid and he cashed his check and he didn't pay me for the dope that I gave him, and I want you to go talk to him, what do you think that that's supposed to mean? I mean, that's not, hey, let's just have a pleasant conversation. Well, actually, the phone call was simply that the state relied on was I want you to talk to Brian about the money. All right. I don't think that you can infer from that talking to someone means that you're going to go over and hit them or kill them. I just do not see how you can extract from that a criminal offense that would be the predicate felony for felony murder. Well, if it were just, I'm sorry, if it were just a conversation, the defendant could have had that conversation, couldn't he? I mean, if it just meant, if talk meant talk, the defendant could have had that conversation. But it was talk in quotes, was it not? So it had a different meaning. Well, but again, as you just said, the defendant did have the conversation and that's what also underlines. But we're assuming that he made the call and had Lamb come over to then, quote, talk to Carrick. If that were his intent to have Lamb take care of it, it makes no sense that he would have approached Brian Carrick in the store and started talking to him. Plus the whole idea that this murder took place in the store and that Mr. Cachero directed it, really I think a strange credulity also that he would have committed or had someone commit a murder in the store. And we know the most disturbing part of this case is that the murder did not occur in the cooler as the state presented to the jury. Sergeant Phillips from the Illinois State Crime Lab presented testimony that the only blood in the cooler was transfer blood. So after Brian Carrick had been injured, he was moved into the cooler. The crime occurred out in the hallway and it was not the result of a fist punch. Well, it couldn't have just as easily have been that he was injured in the cooler and he walks out of the cooler and accidentally smears some blood on those items. No, and the reason that isn't correct is because Sergeant Phillips said that the blood on the wall wasn't drip blood. The blood on the wall was spatter. No, no, I'm talking about the wall. There is no blood on the hallway floor because he was obviously moved in a container. The wall of the hallway? Is that what you're talking about? Yes, that's where the spatter is. That's where the crime occurred. Mr. Thielander pointed out that one punch to the face of Brian Carrick would not have resulted in blood spatter on the lower half of that wall. That was not how this crime occurred. It was not from a punch to his face. Well, Phillips said he didn't know how it occurred, right? How the blood spatter got there. Well, he said that the blood spatter could have come from an instrument, i.e. a knife. He certainly didn't say it came from a punch, and it didn't. I mean, logic would tell you one punch is not going to draw blood that's going to end up on the lower half of the wall. So this crime did not occur in the way that the state presented it. The states tried to say, oh, well, when they carried him out of the cooler, he dripped blood on the wall. Well, their own experts said that's not drip blood. And there is no blood down the hallway. He was moved from the cooler in a container. The trash can was missing from the cooler out the back. And so I think what the court has to look to is, first, are we going to have this be the first case in Illinois where intimidation based on a call where someone simply requests someone to talk to someone becomes the first intimidation felony murder case in Illinois? Well, let's look at maybe something a little bit more specific, and that is the aspect of speech as being a part of intimidation. Is speech required? And if so, what does the record reflect regarding what Lamb said to Carrick and Carrick said to Lamb, or what the defendant said to Carrick and what Carrick may have said back? There actually was no evidence presented about that. There was no evidence presented as to what Lamb said to Carrick, so there's no evidence of Lamb intimidating Carrick, and there's no evidence, specific quotes or anything, about anything that Mr. Cacero said. And, of course, Mr. Cacero has an airtight alibi of being in the break room between 645 and 7 o'clock in this 23,000 square foot store. He's on the north end of the store with five witnesses. That's another problem, I think, with the case. But there isn't anything at the scene that you can draw from other than Lamb's testimony that he simply lost his temper and struck Carrick in the cooler. But case law doesn't say that speech has to be a part of intimidation, does it? No. I agree with the court. You could have a situation where you could infer the intent, I think, from actions or whatever, but you still have to have Mr. Cacero... You still have to have Mr. Cacero making that request, and there's just no evidence. That's a problem with the case. There's just no evidence of those things that you would want to see. Is there any evidence specifically that Carrick's body was ever found? No, Your Honor. His body has never been found. And was there any evidence presented as to the nature and circumstances, other than what you've referred to today, of the manner of death? No. There's nothing except the blood spatter to try to surmise from that or deduce from that what type of injury was inflicted upon him, because he's bleeding... And did Lamb testify at any time that he knew he killed him? He said he did not know he killed him, that he just fell down and then he left. And was he instructed, after what supposedly occurred in the cooler, to leave the premises by the defendant? That's what the state planned. They claimed that the defendant instructed him to do that. But again, there's no evidence that the defendant is in the cooler at that time because he's eating a pizza with his co-workers in the break room, which is another huge problem. And of course, there's only one other individual whose blood is at the scene, and that's Mr. Render. And Mr. Render owed money to Brian Carrick. Mr. Render came to the store that night, right at the time of the murder, and asked that Mr. Carrick be paged. And Mr. Render's blood is on the cooler handle. His blood is at the base of the door on the inside of the cooler. His blood is on the outside door of the cooler. And his blood is on the southeast exit door, down the hallway. There are blood spots on that door. The state claimed he had a problem biting his fingernails. But I think that's a totally implausible explanation for the amount of his blood that was at the scene. So you have another individual whose blood is at the scene who had a dispute with Brian Carrick and who was missing that evening for a period of time. According to Mr. Keppel, he was missing. He was seen by the mob room, and he claimed to have cleaned up the scene. So that's the other layer of, I think, doubt, just complete reasonable doubt about how this crime occurred.  Was Mr. T. Langer in his argument or in his case? What happened, Your Honor, was Mr. T. Langer attempted to interject Mr. Render into the case, and the judge told him that because Mr. Render was deceased that he wouldn't be allowed to do that. But she did allow him to put in evidence of where Mr. Render's blood was found, that he was missing for a period of time that evening. He was given a ride home by Jacob Keppel, so she did allow that evidence in. And since she was allowing blood evidence, did Mr. Keppel ever testify about anything unusual that he observed about Mr. Render? That was, Mr. Keppel, it was the first night he'd ever taken him home, and no, he did not. And Mr. Keppel's floor mat was tested and did not show blood, but Mr. Render's right shoe had his own blood on it, and that was detected by the crime lab, so... You'll have an opportunity for responding. Thank you. Mr. Bernard, good morning. Good morning, Your Honor. I've been suffering from a little bronchitis, so if I choke, cough, or sneeze, I apologize in advance. I would have to say, number one, the defendant doesn't have an alibi. He has some... He has some... general times that people figured out a decade later. This trial didn't start until a decade after the murder, so this alibi evidence, I mean, people... It was general, the times are general. People, as Your Honor's well aware, people don't remember that exact time. They know it was around that time, that's when I took a break, things like that. So it really wasn't an alibi. Aren't they basing a lot of their timing on the fact that Friday is payday, or this particular Friday was payday, the checks come in at a certain time, people who aren't working come in at a certain time, and so it is a fairly regular process on a payday Friday. Yes, it is a fairly regular process, but it doesn't go to the exact time of when Brian was killed. It goes to the fact, well, yeah, when the checks are cut after 4 o'clock, you can come pick them up. Well, that's when the defendant talked to Shane Lamb and said, you know, Brian was in, he picked up his check, cashed it, but he didn't pay me yet. There's something, you know, I may have to call you back. And Lamb then, after he picked up and cashed his check, he went to a party. Now, he was called later, and there's no records of the phone call, but he testified he was called later to come help, and it is in the record that talks to Brian about the money he owed the defendant. Now, during the trial, in closing argument, the State argued that they were using Shane Lamb as an instrument of intimidation, and I believe they also said, we brought Shane Lamb into the store. That's the intimidation. We're using him as a weapon. Is his presence, was his presence enough? Excuse me. Certainly, it was. And how was it enough? Well, number one, these people worked together. They knew Shane Lamb's record. You know, nobody, the kid was not in high school. He was in, you know, prison. But there's no evidence that Brian Carrick moved him. No, but I mean, generally common sense is that people would probably know that. Certainly, the defendant knew that because he talked to Chris Amen, who was his business partner, and what they talked about was money and drugs and all the time, and he introduced Chris Amen as his muscle. If that is not intent to use that person as an intimidator, I don't know what is. This is my muscle. So you're saying, yeah, it's the point of view, then, of the defendant we're looking at, not Carrick? I'm looking at both, yes. Go ahead. We're looking for the intent. That's the defendant's intent, certainly. Whether Brian Carrick was apprehensive, yes, we have to look objectively and subjectively at whether Brian would have been scared. And clearly, he would have been scared when someone the size and reputation of Lamb came in there. He had already been confronted by the defendant. He was a very small person. I think he had some heart problems, so he wasn't the regular size. He was smaller, skinny. He was already being talked to in the produce section when Shane Lamb came in and just joined in the conversation. Well, this was more than a conversation because they were arguing. The guy that cleaned up the butcher shop saw them arguing. He testified to that, and he told another person that worked at the store, Dominic Carpanzo, that he had, a week later, that he had seen them arguing. Well, now you not only have two people arguing with me with a smaller person, you have them then go, you know, the defendant telling Lamb, get in the cooler, it's too loud. So Lamb pushes him by the face into the cooler. Well, again, I would certainly be apprehensive, and I think anybody would, and I'm a big person, and I think anyone who has two people talking about a death, who pushes them in the face in the cooler, out of the public view, would certainly feel intimidated. But that's a battery, isn't it? I mean, isn't there a distinction? I don't think there is a distinction. It is a battery, of course, but doesn't that intimidate you? If someone punches you, that's certainly intimidating. So you're saying the intimidation isn't just words that are spoken, it's physical action, too? Both. Well, if the words that happen to be spoken are, if you don't do this, I'm going to break your legs, yes, now we have both. Yes, but we don't have that testimony. But as a matter of law, don't we have an intimidation statute that says one thing, and we're talking about the practical scene that maybe someone was frightened by someone else, but were they intimidated as a matter of law? And that seems to be the issue here. Well, I don't think it is an issue. I think the fact is, the fact that these two people are standing there arguing with this individual, they were much bigger than he was, and the fact that Lamb was there to collect the debt. You look at the intended defendant. Who was he there to collect the debt for? Himself, so that he could continue dealing, or for Mr. Cachero, so that he would continue providing? For the defendant. Did Mr. Lamb seem to be that much of a gracious person that he would forego his own issues for Mr. Cachero? I don't know that, Your Honor, and the testimony really doesn't tell that. But the fact is, Sean was getting the same deal from the defendant as Brian was. That is, he was getting marijuana in front of him, and then when he sold it all, he paid the defendant $125, same deal. He wanted to keep that same deal going. He thought that was a good deal. So, yeah, in some ways it was helpful for him, too. But we have to go back to the fact that a couple of months before, when the defendant was talking to Chris Ammons, and here's my muscle. The guy's not paying up. I'm going to use this guy as muscle. And then they stopped at a park, and he was introduced to Shane Lamb, which he had met before. Now, that's certainly intent. How he's going to use it. And he even offered to Ammon, hey, you know, if you're having some trouble with some of your dealers, you can use my guy. Is intimidation a specific intent crime or basically a general intent crime? Well, I think it's just general intent. You have a general intent, and you can certainly see it when you look at the evidence, you look at the reasonable inferences, and the surrounding circumstances, that certainly we can see that there is intent there. Now. But isn't the purpose of the intimidation statute, I want something from you or else? So wouldn't that be specific as opposed to just lumping him and pushing him back into the cooler, which we all have generally come to agree is a battery? I think the defendant's intent is specifically to get his money back. I don't know if you can say that that's his specific intent or not. I think generally he wants his money back. Well, the action being done, the words being spoken in particular, are designed to get the money back. Yes. So isn't that very different than, say, a battery as we see it generally? I guess I would agree. As a matter of law. I'm not talking about impractical. I'm talking about as a matter of law because that's all we can do. Well, yeah. We know that the reason for these words and these actions and this big person is for the specific intent of making this drug dealer pay up who's not paying up. Was there any evidence of what was said to whom put in the record? Regarding? Regarding the conversation Lamb had with Carrick or the defendant had with Carrick? That may have been overheard by anybody? There was none. It was just the man who cleaned up the butcher shop heard them arguing. Right. But there was no specific words that he testified to. Right. And the cases that you use in your brief all do involve some sort of speech, do they not? Yes, I think so. So would you think it's primarily a speech crime, that there has to be some speech along with it in order for us to find intimidation as a matter of law? Well, no. I think, for one, because of the size of the parties versus the size of the victim, that alone can be intimidating. And as you were talking before, we don't have to have any speech. Actions can produce intimidation also. Now, you know, you see on the movies the guys, you know, want something and they kind of pull their gun out. They don't say a word. Well, you know, that's intimidation. Well, same thing. I pull out this large man who is known for his propensity for violence. I think that certainly has given you enough reason to be intimidated, if you were Brian. Well, the language of the statute is that he or she communicates to another this threat to inflict physical harm. So that communication could be a nod. Sure. It could be pulling your coat back to show your weapon. Right. But there has to be some communication, right? Right. Do we know what the communication was here? Other than he punched him in the face, he says he punched him in the face in the cooler, right? Well, yes. The communication was certainly Shane Lamb, who is off on Fridays, had already been in and picked up his check, shows up just at the time when the defendant starts arguing with Brian. Well, that could have been happenstance, could it not? No, because he was already gone. Why would he come there? Why would he go in the back of produce section? He wasn't working there at the time. There was something set. Brian had, you know, been dealing for a while with the defendant. Now, I mean, we have to use our common sense here. You have to look at that. Here's a big person that comes and starts arguing also. As soon as he starts saying words to Brian and starts getting mad and there's, you know, it's starting to get too loud to be in the produce section, there's intimidation. It doesn't matter what words. We know that words were said that were going to intimidate Brian. But does it matter if the words said are because Shane's mad at Brian or Mario's mad at Brian? I'm not sure. If Shane's mad because he's going to lose his business, too, or he's going to lose his opportunity, too, and he hauls off and slugs him, was that at Mario's request or was that his own problem? He came to be in this situation because defendant called him. And defendant called him and he testified that defendant called him to talk to Brian about the money he owed the defendant. And Shane tells us this. Shane tells us that. That testimony was believed by the jury. We have to look at all this in the light most favorable to the prosecution here. And under that standard, it's clear that the jury, you know, made the reasonable inferences that this would scare the victim. And there was a reason he should be scared. Aside from Mr. Lamb testifying, was there was one other person who really implicated the defendant? That was Mr. Lippert? Yes. That used to be a friend of the defendant. They went out drinking several years later. And that's what I want to talk about. They're at Blarney Island. I'm sorry. They're at Blarney Island? Yes. Okay. A notorious place on the chain of legs. I hear. But they beat an attorney there. And I understand that lots of cases are made by informants and by persons like Mr. Lamb with immunity. But why would the prosecution then bring out from this attorney, who's listening and actually he's overhearing some of it, some of it is directly with him at somebody's request, why would he basically find or basically tell the jury that Mr. Lamb is a liar? Why would the state elicit that testimony? I don't. I'm not sure that the state elicited that testimony, I think. No, the prosecutor had him on the stand, and this is what happened. Maybe he didn't say liar, but he certainly called him out as being untruthful. Why would the state do that? That was Attorney Donahue. Yes. Why would the state do that? Why would the state do that? I mean, it's their primary witness. It's their star witness. Why would they want to push this case in jeopardy by it? Well, certainly if I was the assistant, if this information was true, I'd try to get it out and then destroy it, which he did. But didn't that in essence discredit his own star witness? Well, I mean, Shane Lamb was a witness. He wasn't a star witness. People know of his reputation. But he still, you know, he was in a position where it was him and all the people that were, you know, defendant and his friends there. With the lawyer, obviously there was some kind of setup going on, and I think he just, you know, the guy just, you know, gets to the point sometimes he feels he has to say something. Well, I mean, he's the star witness in the sense that he's the one who testified as to what allegedly happened the night that Carrick disappeared, right? Other than, I mean, there really isn't anyone else who said they were in the cooler with them or had face-to-face contact or conversation with them other than the defendant. Correct. Any other questions? Was the cause of death proven? How did the state prove the cause of death in this case? Well, the body was never found. It's been over a decade later. His blood was found in the cooler on boxes on the cooler rack. Obviously his body was disposed of. They found his blood on boxes in the dumpster. So you're saying passage of time and circumstantial evidence? Correct, correct. It's a circumstantial case, certainly. Now, you know, if I could, if I may, the defense counsel had talked about the spray pattern on the wall. Well, when you're cleaning up a body or you're scared, we don't know how that blood got on that wall. You know, they could have picked, the defendant could have picked up the victim and, you know, threw him over his shoulder. If there's blood coming out of his head, they could have sprayed. There's just no way to determine one way or the other. But we do have this corroborating evidence of Lamb's testimony of the floor being mopped, of finding the blood, the transfer blood on the boxes, on the rack, on the cooler floor. We have the bottle cap with the victim's DNA that was found in the middle of the cooler. I think it was a Mountain Dew cap or something like that. And we have, you know, the testimony of the guy who's cleaning up the butcher shop, that there was an argument there. So I think Sean Lamb, he was our witness, but certainly there was a lot of other evidence that corroborates his testimony. Who did the cleanup? Do we know that from the record? We don't know that, probably the defendant. Maybe Render, but it doesn't matter if Render helped him or not. The defendant still initiated this whole offense. Did Mr. Render testify before the grand jury at all? I think he did, yes. Did he testify in the first trial, or was he deceased by that time? I don't remember now. I believe he was deceased. But Lamb testified in front of the grand jury, did he? Mr. Lamb testified in front of the grand jury, did he not? Yes, he did. And when he testified in front of the grand jury, he denied knowing how Carrick died, isn't that correct? Correct. But after he got immunity, then that's when he told the story that we're talking about now that came out in the second trial, isn't that correct? Right. We have to remember, when he was given immunity, we as a state had no idea what he was going to say. He could have still said, I have nothing to do with it. And he explained, I think, in the testimony in cross-examination, well, of course I'm not going to admit that I had anything to do with it. You know, until he got immunity. He's just taking care of his own person. Did he ever testify how the body was, how Brian left the building, whether he was still alive or whether he was dead or what the situation was? No, he had no idea because the defendant immediately shooed him out the door and said, get out of here, take care of it, which is just another. Well, what does that mean, get out of here, take care of it? That's two different messages. No, he said, you get out of here, I'll take care of it. That's what the defendant said, which is just another bit of evidence that shows the intent of the defendant. And Lamb testified to that? Yes. Okay. So he came across, by that time, are you saying he was in the cooler area the entire time, the produce cooler area, or are you acknowledging that he was having pizza on the other side of the building with Eddie Carrick at some point in time? The defendant? Yes. At the time that Brian was, I can't say assaulted, but intimidated, he was there because Shane came in and Mario was already arguing with Brian. But then he left to go get pizza, didn't he? No, that was before that. When were they eating the pizza? I think they had a break before the actual, that's what I'm saying, there's no alibi there. You know, everybody was in the break room. Well, this happened after, obviously. They ate their pizza. Anything else? No. Thank you, sir. Thank you, guys. Ms. Zellner. Just a couple of points. I think the case law is clear that intimidation is a specific intent crime. That's people versus for QC. I think also that in the initial conversation between Liam and Mario, that there would have to be a specific request to intimidate, which there wasn't. And then I agree with Justice Spence that at the scene, someone could display a gun. You could have actions like that. But the really key point, I think, is what Justice Hutchison is saying. We have testimony from Shane Lamb that Brian, he also wanted to talk to Brian about continuing to pay the money so the operation would continue because of his own self-interest in it. So the testimony is very clear that Lamb had his own motive. And so if this turns out to be Battery or Shane Lamb intimidating, there's no way to implicate Mario Cachero in it because under the accountability statute, there's no common design based on the words. But we appear to just have an independent Battery. It's also important on this alibi, the reason our brief has the timeline laid out so carefully is there was a pizza order, there was a pizza receipt. Cachero goes to pick the pizza up and returns to the break room at 640. And all of those employees independently put themselves in the break room with him from 645 to 7. At 7 o'clock, Jacob Keppel goes to the cooler, finds the big pool of water on the floor. It's already been cleaned up. He sees the mop bucket tracks on the floor and that Mountain Dew bottle cap, which was probably in Brian's pocket, was on the floor. So the murder has already occurred by the time Jacob Keppel walks into the cooler. In terms of cleanup, it's Rob Renner who cleans up the scene. And the court sustained an objection to Mr. Keppel testifying that Rob Renner told him when he got in his car how he spilled the mop bucket on his pants, which had blood from the meat department in it. And so Renner acknowledged he had blood on his pants when he got into the car. And, of course, as I was telling you, the testimony is that Renner came back to the store to speak to Carrick and told people that he owed Carrick money. And there was a page that went off asking Renner to meet with with Mr. Carrick at the time. I want to talk about two witnesses quickly. On this, Mr. DiPiro, who said that he saw an argument, he thought, between the defendant, Brian, and Shane Lamb. Mr. DiPiro is 90 years old. At the time of the second trial, he's really unable to testify, so they stipulate to his testimony in the first trial. But it was pointed out to him by Mr. Thielander that he had mentioned Lamb being in the conversation in the first trial. And Mr. DiPiro stated, quote, he wasn't there when I testified the last time. That's a record cited 1302. He was asked if Shane Lamb was a big or small guy at the second trial, and he said, oh, it's just average size. He did not see Shane Lamb. May have seen Rob Renner arguing with Mr. Carrick, but he did not see Shane Lamb. Chris Amon, of course, was given immunity for any future drug deals, and his testimony was severely impeached by Mr. Thielander. When he claimed to have overheard or had a direct conversation with the defendant about Shane Lamb being the new muscle for his operation, then he's impeached because he'd actually testified before he'd overheard this conversation. But again, as Justice Hutchison was pointing out there, and also Justice Zeno, there's no evidence that Brian Carrick knew any of this, that he had any reason to be afraid of Shane Lamb. He appeared to be quite comfortable with him. And so the idea that just his physical presence, that someone could be an instrument of intimidation, maybe if you were a mob hit man, you know, with a movie ad or something, where people would recognize you. But I do not see how that could become the standard in Illinois, just physical size. With all of the other problems that we see in this case, Amon and Lippert. Lippert was drunk at the time he gave his first statement. He'd had 12 beers and two shots within four to five hours of that statement. He said the whole conversation seemed like a dream. And he was also given a deal. I think extremely importantly is that Shane Lamb was provided complete total immunity for his testimony. That's very unusual. That's something the jury did consider, though, right? They did. The jury was informed of that. The jury was informed that he was getting total immunity. And the jury has given an instruction on what factors they are to consider in determining whether or not the witness is credible. Yes. And I agree with you, Your Honor. But it doesn't change the fact that the evidence in this case, the evidence in this case that the state presented is directly contradicted by their own witnesses, by Shane Lamb and by the forensic expert who testified, Sergeant Phillips. About that blood spatter. He specifically said that's not drip blood. And if you were carrying a body, you would have blood drips all the way down the hallway. This case, this crime did not occur the way the state presented it. And Mr. T. Lander severely impeached all of the state witnesses. But the threshold question is, as a matter of law, was this intimidation? And we have no evidence of what was said at the scene with Brian Carrick. So even after Mr. T. Lander's valiant efforts, the jury still believed Shane Lamb. The jury believed Shane Lamb because I'm sure that the fact that he said that he participated in the murder, but that does not mean that this court should affirm a case that's built on a house of cards. Because this case, forensically, is preposterous. And this case, in terms of the actual theory that this is intimidation, we can have instruments now of intimidation. I would hope that doesn't become the new standard in Illinois. Illinois, as we all know, has never found intimidation as a predicate felony for felony murder, nor has any other state in the country. Thank you. Thank you. Thank you, counsel. Again, thank you for your arguments. We will take the matter under advisement. We will render a decision in due course, and we will take a short recess to get ready for our next case. Thank you.